Richard Lyons (SBN 020558)
**KELLY & LYONS, PLLC**
5020 E. Shea Blvd., Ste. 150
Scottsdale, Arizona 85254
Phone: (480) 867-3410
Fax: (480) 867-3411
Attorney e-mail:      rlyons@carsonlawfirm.com

Amy Vela (SBN 027355)
Tommy Richardson (SBN 018582)
Friedl Richardson
13633 N. Cave Creek Road
Phoenix, Arizona  85022
Phone: (602)553-2220/Fax: (602)287-9511
Attorney email: Office@FriedlRichardson.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Maggie Jones as next best friend of Julianna Kinnard, on behalf of the statutory beneficiaries of Joshua Kinnard; Maggie Jones on behalf of Julianna Kinnard; Maggie Jones on behalf of Ryan Granneman; Maggie Jones on her own behalf; and Francina Kinnard as executor on behalf of the Estate of Joshua Kinnard, | No. <br><br> **COMPLAINT** |
| Plaintiffs, | |
| v. | |
| The United Stated of America, | |
| Defendant. | |

**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT**

Through undersigned counsel, for their Complaint against Defendant the United States of America, Plaintiffs Maggie Jones ("Maggie") and  Francina Kinnard allege as follows:

**INTRODUCTION**

1.      This is an action against the Defendant United States of America under the Federal Tort Claims Act, (28 U.S.C. §2671, et seq.) and 28 U.S.C. §1346(b)(1), for negligence and professional malpractice in connection with medical care provided to Joshua Kinnard ("Joshua") by the Department of Veterans Affairs at the Phoenix VA Medical Center and other facilities.

2.      As a direct result of the United States of America failing to provide reasonable mental health care consistent with the standard of care, Joshua suffered a mental health crisis and committed "suicide by cop" at the age of only 37, with Maggie, Julianna, and Ryan only feet away from the gunfire that killed him.

3.      As a direct result of that negligent medical care, Maggie, Julianna, and Ryan witnessed the violent death of the most important man in each of their lives.

4.      The claims herein are brought against the Defendant pursuant to the Federal Tort Claims Act (28 U.S.C. §2671, et seq.) and 28 U.S.C. §1346(b)(1), for money damages as compensation to the statutory benefiaries and Estate of Joshua Kinnard for his wrongful death.

5.      Joshua's statutory beneficiaries under Arizona law are Julianna (minor daughter), Franncine Kinnard (mother), Randall Kinnard (father), and Jaxson Kinnard (minor son).

6.      The claims herein also are brought against the Defendant for money damages for injuries suffered by Maggie, Ryan, and Julianna as they witnessed Joshua's suicide-by-cop.

7.      The claims herein also are brought against the Defendant for money damages suffered by Joshua Kinnard's Estate.

8.      Each of Maggie, Julianna, Ryan, Francina, Randall, and Jaxson, whether as statutory beneficiaries on their own behalves or as tort victims as described herein, has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act.

Their respective Standard Form 95s with accompanying documents are attached hereto as Exhibits A-F, all of which is incorporated herein by reference. Each and every demand for relief contained in each and every Standard Form 95 is hereby reasserted.

9.      This suit has been timely filed, in that each of the claimants timely served notices of their claims on the appropriate agency or agencies of the United States of America; these agencies issued a final denial or denials of each claim on or about May 27, 2020; and less than six months have passed since each of those denials.

**PARTIES, JURISDICTION AND VENUE**

10.     At all times relevant, Joshua Kinnard was a resident of Maricopa County, Arizona, and all acts or omissions complained of herein occurred within Maricopa County, Arizona, thus venue is proper in the U.S. District Court of Arizona.

11.     At all relevant times, Maggie, Ryan, Juliana, and Randall Kinnard were residents of Maricopa County, Arizona.

12.     At all relevant times, Francina was a resident of Winnebago County, Wisconsin.

13.     At all times relevant, Jaxson was a resident of King William County, Virginia.

14.     Defendant United States of America, through its agency, the Department of Veterans Affairs, operates the Veterans Affairs Medical Center located at 650 East Indian School Road, Phoenix, Arizona 85012.

15.     Defendant the United States of America, including but not limited to its directors, officers, operators, administrators, employees, agents, and staff at the Phoenix VA Medical Center, and including all healthcare providers including mental healthcare providers who cared for Joshua anytime in the state of Arizona, are hereinafter collectively referred to as the "Phoenix VA."

16.     At all times relevant to this Complaint, the Phoenix VA held itself out to Joshua and to Plaintiffs as a provider of high quality health care services, with the

expertise necessary to maintain the health and safety of patients like Joshua.

17.     At all times relevant to this Complaint, the directors, officers, operators, administrators, employees, agents, and staff were employed by and/or acting on behalf of the Defendant. Furthermore, the Defendant is responsible for the negligent acts of their employees and agents under *respondeat superior* and principles of agency.

18.     Jurisdiction is proper under 28 U.S.C. § 1346(b)(1), as the damages claimed exceed the minimum amount in controversy of $75,000.00.

19.     Venue is proper under 28 U.S.C. §1402(b) in that all, or a substantial part of the acts and omissions forming the basis of these claims occurred in the District of Arizona.

20.     Plaintiffs hereby demand a trial by jury.

## FACTUAL ALLEGATIONS

21.     Joshua Kinnard was born on September 14, 1980, his mother being Francina and father being Randall.

22.     Joshua was a dedicated and decorated Marine from 1999 through 2003, serving on the front lines of the Iraq invasion.

23.     After returning home, Joshua had a son, Jaxson Kinnard, born on June 04, 2008.

24.     Joshua had battle fatigue and wanted out of the military.  He tried his hand at a variety of odd jobs before settling into law enforcement, and particularly corrections. Joshua's job with corrections became a great source of accomplishment and personal pride.

25.     In October of 2014, Joshua met Maggie.

26.     Maggie already had sons from an earlier relationship, one of them being Ryan, and Joshua became a father-figure for Ryan.

27.     In roughly August of 2015, Maggie & Joshua became engaged to be married. On November 30, 2015, Julianna was born to Joshua and Maggie. The couple

was excited planning their wedding to begin their life together with their new family.

28.    In the months after Julianna's birth, Joshua seemed to change, growing short tempered, lashing out, and just not being his usual agreeable self.

29.    Joshua's temper grew into more pronounced signs of mental health problems.  In September of 2017, Joshua was found to have post-traumatic stress disorder from his combat experience in Iraq, and he was deemd 50% disabled.

30.    Joshua's PTSD and its effects became more and more pronounced and worrisome as the end of 2017 approached.

31.    Joshua started having nightmares about a specific event, when he shot and killed a young Iraqi girl hold a shiny object that turned out to be not a detonator, but a barrette in her hair.

32.    Joshua would wake up in a cold sweat, screaming in horror about this poor innocent Iraqi girl.

33.    Maggie attempted to convince Joshua to seek mental health treatment but he refused, knowing that it would interfere with his corrections career.

34.    Joshua's mental health crisis deepened at the start of 2018, and he began talking about suicide attempts, and then feigning suicide attempts, and he began drinking very heavily.

35.    Joshua's mental health crisis came to a crescendo when he took Maggie hostage in their home, handcuffing her to a banister and threatening to end her life, then their children's, and then his.  Shortly thereafter, Joshua lined up bullets on the family room floor, naming them after Maggie, Julianna, Ryan, Maggie's other sons, and the final one for himself.

36.    On February 13, 2018, with the help of friends and family, Maggie finally convinced Joshua to seek mental health treatment. With Maggie accompanying, Joshua was first seen at his primary care doctor, Dr. Dare, who asked him if he was suicidal for which he responded "Yes." Doctor then asked him if he was homicidal, to which he

responded "Yes." Doctor Dare then advised Joshua that he had 2 hours to go home, get his affairs in order and would need to check himself into the Phoenix VA or the police would be at their home to escort him if he did not comply.

37.     Upon arrival at the Phoenix VA, Maggie and Joshua checked-in through the ER entrance. The intake specialist informed Joshua that they were expecting him, as Dr. Dare called ahead.

38.     The intake specialist asked Joshua if he was suidical, and he answered "Yes."

39.     The intake specialist asked Joshua was homicidal, he once again answered "yes."

40.     Maggie also let the practitioners know in no uncertain terms that Joshua had suicidal and homicidal tendencies.

41.     Shortly after arrival, Joshua was admitted for a 72 hour hold for suicidal tendencies.

42.     Joshua was given a mood stabilizer for the first time in a very long time, so he told his practitioners right away that he no longer felt like killing himself.

43.     After this claim of no more present suicidal ideation, without consulting Maggie or any of Joshua's family members for their input, and nearly a full day before the 72 hour safety hold was to expire, Joshua's practitioners decided to let him go early.

44.     Joshua called Maggie from the VA to prepare to come pick him up.

45.     Maggie was shocked that VA providers would agree to release Joshua early, after they were told of his suicidal ideation and homicidal threats.

46.     Maggie called her mother for advice, and Maggie was told to call the VA and make sure they know exactly what Joshua was threatening to do right before admission.

47.     Maggie hung up and immediately called the VA, and she spoke with a nurse about Joshua.

48.     Maggie told the nurse that just days earlier, Joshua lined up and named bullets after her and her children, and that he was a danger to himself and his family, and she pleaded with the nurse not to let Joshua out.

49.     In response, the nurse told Maggie that because she was not an immediate family member, being merely a fiancé, Maggie was not allowed to interfere with treatment decisions between Joshua and his doctors.

50.     Maggie knew of no other solution, so she went to pick up Joshua and she hoped for the best, 60 hours into a 72 hour safety hold.

51.     By failing to provide proper evaluation and treatment while Joshua was at the Phoenix VA, the healthcare providers at the Phoenix VA failed to comply with the standard of care applicable to those in the specialties they claim.

52.     By discharging Joshua under then-present medical circumstances, the healthcare providers at the Phoenix VA failed to comply with the standard of care applicable to those in the specialties they claim.

53.     By discharging Joshua without consulting with those caring for Joshua upon discharge, healthcare providers at the Phoenix VA failed to comply with the standard of care applicable to those in the specialties they claim.

54.     By refusing to consider the input of family members and friends when such input was specifically offered, the healthcare providers at the Phoenix VA failed to comply with the standard of care applicable to those in the specialties they claim.

55.     Phoenix VA healthcare providers had a duty to warn and intervene on behalf of Maggie, Ryan, and Julianna, when they became aware that Joshua made direct threats on their lives.

56.     By failing to warn and intervene on behalf of Maggie, Ryan and Julianna after becoming aware of those threats, the healthcare providers at the Phoenix VA failed to comply with the standard of care applicable to those in the specialties they claim.

57.     By failing to enact policies and procedures for the discharge of patients

consistent with the standard of care, agents and employess of the Phoenix VA failed to comply with the standard of care applicable to those in the medical and/or other specialties they claim.

58.     Joshua saw a VA mental health provider several days after discharge and Joshua felt like 'a zombie," but all this provider did was ply Joshua with even heavier medication.

59.     Joshua very predictable stopped taking this heavy dosage anti-psychotropic medication due to its side effects.

60.     Joshua's mental health crisis immediately returned along with Joshua's suicidal and homical ideation, and Maggie had no idea what to do because the Phoenix VA already was aware of, and completely dismissed, this very troubling behavior. Maggie decided to send the kids to live with a friend temporarily, and to tough it out and tried to save Joshua on her own.

61.     Less than two weeks after he was released from the Phoenix VA, on February 26, 2018, Maggie returned home from work and found Joshua in deep despair, hinting of suicide, and making very little sense.

62.     As the evening turned into night, Joshua slipped into their very cold pool for no reason, and Maggie called 911.

63.     Two policemen arrived and they were discussing how to get help for Joshua in front of the house when Maggie's friend, along with Julianna and Ryan, pulled-up and parked in front of the house.

64.     As Maggie and the officers continued talking, while remaining approximately 30 feet away from the group the entire time, Joshua walked out of the house and across the driveway to his truck.

65.     Joshua opened up the door, started rummaging through the truck, and then loudly proclaimed in stocatto fashion, " where…is…my…gun."

66.     He then turned and pointed a gun at the officers, who shot Joshua down in

a hail of gunfire, within feet of Maggie, Ryan, and Julianna.

67.   The officers had no choice but to shoot Joshua, who clearly wanted to commit suicide-by-cop.

68.   As a direct and proximate result of the Phoenix VA healthcare providers breaching the applicable standard of care, Joshua committed suicide-by-cop, and Julianna, Jaxson, Francina, and Randall lost the love of their father and son.

69.   Julianna, Jaxson, Francina, and Randall are Joshua's statutory beneficiaries pursuant to A.R.S. 12-611 et seq.

70.   As a direct and proximate result of the Phoenix VA healthcare providers breaching the applicable standard of care, Maggie, Ryan and Julianna witnessed the violent death of the most important man in their lives, by police gunfire, while within the zone of danger as that term is defined in *Keck v. Jackson*, 122 Ariz. 114, 593 P.2d 668 (1979).

71.   As a direct and proximate result of the Phoenix VA healthcare providers breaching the applicable standard of care, the statutory beneficiaries have suffered.

72.   As a direct and proximate result of the Phoenix VA healthcare providers breaching the applicable standard of care, The Estate of Joshua Kinnard, PB2018-003633 has suffered damages.

## CAUSES OF ACTION

### COUNT I — MEDICAL NEGLIGENCE

73.   Plaintiffs incorporate each and every allegation above as if fully set forth herein.

74.   The Defendant's employee and agent healthcare providers had duties to provide ordinary care to Joshua, consistent with the degree of care and skill expected of providers in the healthcare community at large.

75.   The Defendant, through its agents and employees, breached those duties of care to Joshua and to Plaintiffs.

76.     The Defendant, through its employees and agents, failed to provide provide mental health services to Joshua in accordance with the standard of care.

77.     The Defendant, through its employees and agents, failed to exercise that degree of care, skill and learning expected of a reasonable, prudent healthcare providers in the profession or class to which he or she belongs within the state acting in the same or similar circumstances.

78.     As a direct and proximate result of Defendant's failures to comply the standard of care, Joshua died and his statutory beneficiaries lost the love and companionship of their father and son.

79.     As a direct and proximate result of Defendant's failures to comply with the standard of care, Maggie, Ryan, and Julianna witnessed Joshua's suicide-by-cop.

80.     As a direct and proximate result of Defendant's failures to comply with the standard of care, The Estate of Joshua Kinnard has suffered pecuniary harm.

81.     The acts and/or omissions set forth above would constitute a claim under the law of the State of Arizona.

82.     The Defendant is liable pursuant to 28 U.S.C. 1346(b)(1).

## COUNT II — WRONGUL DEATH

83.     Plaintiffs incorporates each and every allegation above as if fully set forth herein.

84.     The Defendant had a duty to provide ordinary care, and to exercise that standard and degree of care and skill required of health care providers, consistent with the expertise that the Defendant presented to the community at large.

85.     The Defendant, through its agents and employees, breached its duty of care to Joshua.

86.     By failing to provide psychiatric services in accordance with the standard of care, Joshua died and his statutory beneficiaries lost the love and companionship of their father and son.

87.     The acts and/or omissions set forth above would constitute a claim under the law of the State of Arizona.

88.     The Defendant is liable pursuant to 28 U.S.C. 1346(b)(1).

### COUNT III — ESTATE CLAIM

89.     Plaintiffs incorporates each and every allegation above as if fully set forth herein.

90.     The Defendant had a duty to provide ordinary care, and to exercise that standard and degree of care and skill required of health care providers, consistent with the expertise that the Defendant presented to the community at large.

91.     The Defendant, through its agents and employees, breached its duty of care to Joshua.

92.     By failing to provide psychiatric services in accordance with the standard of care, Joshua died and his estate has suffered damages compensable pursuant to A.R.S. § 14-3110.

93.     The acts and/or omissions set forth above would constitute a claim by The Estate of Joshua Kinnard under the law of the State of Arizona.

94.     The Defendant is liable pursuant to 28 U.S.C. 1346(b)(1).

### COUNT IV — NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

95.     Plaintiffs incorporates each and every allegation above as if fully set forth herein.

96.     The Defendant, through its agent and employees, had a duty to provide ordinary care, and to exercise that standard and degree of care and skill required of health care providers, consistent with the expertise that the Defendant presented to the community at large.

97.     The Defendant, through its agents and employees, breached its duty of care to Joshua.

98.     The Defendant, through its agents and employees, also had a duty to the

public-at-large to protect it from individuals it knows or has reason to know is a danger to the public at large.

99.   The Defendant, through its agents and employees, also had a duty to Julianna should have known that Joshua was a danger to Maggie, Ryan and Julianna.

100.   The Defendant along with its agents and employees breached those duties by failing to take reasonable steps and to provide reasonable care to prevent Maggie, Ryan, and Julianna from being harmed.

101.   As a result fo Defendant's breaches of the aforementioned duties, Maggie, Ryan, and Julianna were caught up in a gunfight and witnessed the family patriarch's death-by-police gunfire.

102.   The emotional trauma from witnessing such a horrific event, especially at such young ages as Ryan and Julianna, cannot be comprehended.

103.   Maggie, Ryan, and Julianna will suffer emotional trauma from witnessing that horrific event for the rest of their lives.

104.   By being within feet of the guns that shot down the family's patriarch, Maggie, Ryan and Julianna were within the "zone of danger" as that term is contemplated in *Keck v. Jackson*, *id*.

105.   Joshua had relationships with Maggie, Ryan, and Julianna such that they are proper plaintiffs pursuant to *Keck v. Jackson*, *id*.

106.   The acts and/or omissions set forth above would constitute a claim under the law of the State of Arizona.

107.   The Defendant is liable pursuant to 28 U.S.C. 1346(b)(1).

**COUNT V - VICARIOUS LIABILITY, RESPONDEAT SUPERIOR, OSTENSIBLE AGENCY AND/OR AGENCY**

108.   Plaintiffs incorporates each and every allegation above as if fully set forth herein.

109.   At all times relevant to this case, the directors, officers, operators,

administrators, employees, agents, and medical staff were employed by and/or acting on behalf of the Defendant.

110.   At all relevant times to this Complaint, the directors, officers, operators, administrators, employees, agents and staff acted within their respective capacities and scopes of employment for the Defendant.

111.   The directors, officers, operators, administrators, employees, agents and staff negligently and/or recklessly, directly and proximately caused Joshua's death and Plaintiffs' injuries, including both acts of omission and acts of commission.

112.   Vicarious liability as set forth above would attach under the law of the State of Arizona.

113.   The Defendant is liable pursuant to 28 U.S.C. 1346(b)(1).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs hereby pray that judgment be entered in their favor, against the Defendant, as follows:

A.   For general damages for Joshua's statutory beneficiaries, for his wrongful death;

B.   For general damages for Maggie, Ryan, and Julianna for the emotional and physical trauma they have experienced and will continue to experience, for witnessing Joshua's suicide;

C.   For special damages to Joshua's estate including lost income as a result of Joshua's disability and premature death;

D.   The damages for the expenses of funeral and burial;

E.   For  costs and attorneys' fees incurred in this civil action as they may be allowable by law, together with such further and additional relief at law or in equity that this Court may deem proper.

. . .

Dated this 9th day of November, 2020.

**KELLY & LYONS, PLLC**


By:   _/s/ Richard D. Lyons_____
Richard D. Lyons, Esq.
*Attorneys for Plaintiff Jones*


**FRIEDL RICHARDSON, PLLC**


By:   _/s/ Amy Vela_____
Amy Vela, Esq.
*Attorneys for Plaintiffs Francina Kinnard,*
*Randall Kinnard, Jaxson Kinnard, and The*
*Estate of Joshua Kinnard*


## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2020, I electronically transmitted the

attached document to the Clerk's Office using the CM/ECF System for filing and

transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

By: _s/ Stephanie Spade_____